**NOT FOR PUBLICATION**

**United States District Court**
**for the District of New Jersey**

| | |
|---|---|
| MAURICE ANDERSON,<br><br>    Petitioner,<br><br>    v.<br><br>ADMINISTRATOR   Northern State Prison;<br>ATTORNEY GENERAL for the State of<br>New Jersey,<br><br>    Respondents. | Civil No.: 09-1168 (KSH)<br><br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

Proceeding pro se, Maurice Anderson has filed an all-inclusive amended petition for a writ of habeas corpus [D.E. 16], pursuant to 28 U.S.C. § 2254.  He challenges a 2001 Essex County conviction on robbery, weapons, and drug charges arising out of two convenience-store robberies.  Having reviewed the submissions and applying the required legal standard, the Court will deny the amended petition.

**I.  BACKGROUND**

The following facts are drawn from the New Jersey Appellate Division's decision on direct appeal, which is attached as Exhibit U to the state's answer.  [D.E. 21-25.]

At about 8:00 P.M. on October 24, 2000, Maurice Anderson, Dadje Dawara, and Hamadi O. Aaron robbed Crosstown Food Market, in Newark, New Jersey, of about $550.  During the robbery, a gun was brandished and Anderson sprayed mace on the owner of the convenience store, who called the police and gave them the color, make and license plate of the getaway car.

23   About ten minutes after the first robbery, Anderson and the others robbed the Central Avenue

24   Supermarket, also in Newark.  Then they drove to Dawara's girlfriend's house, dropped off the

25   gun, and drove to Aaron's house.  As they were about to drive to Anderson's house the police

26   apprehended them.

27       The three men were indicted on several counts of armed robbery, weapons, and drug

28   charges.  Aaron entered into a plea agreement and testified against Anderson and Dawara at their

29   joint trial.

30       An Essex County jury found Anderson guilty of four counts of first-degree armed

31   robbery, unlawful possession of a handgun, possession of a handgun for an unlawful purpose,

32   possession of cocaine, possession of cocaine with the intent to distribute, unlawful possession of

33   mace, and possession of mace for an unlawful purpose.   Anderson received an aggregate

34   sentence of 40 years.   Under New Jersey sentencing law, he must serve 28 years of the sentence

35   before becoming eligible for parole.(*See* Judgment [D.E. 25-21].)  The New Jersey Appellate

36   Division affirmed in an unpublished opinion (*see generally* Dir.App.Op. [D.E. 21-25]) and the

37   New Jersey Supreme Court denied certification on April 26, 2004.  *See State v. Anderson*, 180

38   N.J. 152 (2004).

39       Anderson timely filed his first state petition for post-conviction relief ("PCR"), in which

40   he raised several ineffective assistance of counsel claims and other claims of trial error.  Initially

41   filed pro se, Anderson's petition was eventually supplemental by counsel.  After a hearing, the

42   judge who had presided over the trial denied relief via an opinion from the bench.  The Appellate

43   Division summarily affirmed.  *See generally State v. Anderson*, No. A-2128-06T4, 2008 WL

2

44 695864 (App. Div. Mar. 17, 2008).  Certification to the Supreme Court was denied.  *See State v.*

45 *Anderson*, 195 N.J. 519 (2008) (table).

46   Anderson filed a second, pro se PCR petition on September 24, 2008.  By order filed July

47 2, 2010, the same judge denied the petition, doing so at least partially on the merits.  Anderson

48 does not appear to have appealed this disposition.

49   While the second PCR petition was pending, the Clerk of this Court accepted for filing

50 Anderson's federal 28 U.S.C. § 2254 petition.  [D.E. 1.]  In response to a *Mason* order,[1]

51 Anderson represented that he wished to file an all-inclusive petition after state-court proceedings

52 had come to a close.  [D.E. 3–4.]  Via order, the initial habeas petition was dismissed without

53 prejudice as withdrawn, but because Anderson showed some confusion about what he was

54 requesting, he was given 30 days to reconsider his decision.  [D.E. 5.]  Anderson wrote again

55 within this period, saying that he would like to file an all-inclusive petition that would be stayed

56 until the second PCR petition was fully resolved.  [D.E. 6.]  In another order [D.E. 7], the Court

57 ordered the matter reopened, denied a stay, and warned Anderson that his original petition [D.E.

58 1] would be ruled upon unless he responded within 14 days.  Anderson requested the Court

59 reconsider that decision.  [D.E. 8.]  Ultimately, while these procedural orders in federal court

60 were being issued, the state court ruled against Anderson on the second PCR petition and he filed

61 an amended habeas petition [D.E. 16].

62   The amended petition raises a mixture of claims arising out of Anderson's direct and

63 collateral state challenges to his conviction and sentence.  He claims that the prosecutor's use of

64 peremptory challenges was racially motivated, and that the trial court should have granted a

---

[1] *See Mason v. Meyers*, 208 F.3d 414 (3d Cir. 2000).

65  requested mistrial after jury selection.  Additional claims are that his sentence was disparate and

66  excessive; counsel was constitutionally ineffective in several ways; the admission of digital

67  photographs violated due process; and the failure to grant him a severance violated due process.

68  The state filed an answer, arguing among other things that certain grounds were unexhausted or

69  procedurally defaulted and that the petition was untimely.  [D.E. 21.]  Anderson filed a reply.

70  [D.E. 24.]

71  ## II.  STANDARD OF REVIEW

72  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") sets limits on the

73  power of a federal court to grant a habeas petition to a state prisoner.  28 U.S.C. § 2254.  If a

74  state court has adjudicated a petitioner's federal claim on the merits, a federal court "has no

75  authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or

76  involved an unreasonable application of, clearly established Federal Law, as determined by the

77  Supreme Court of the United States', or 'was based on an unreasonable determination of the

78  facts in light of the evidence presented in the State court proceeding.'"  28 U.S.C. § 2254(d).

79  "'[C]learly established Federal law'" for purposes of § 2254(d)(1) includes only "the

80  holdings, as opposed to the dicta, of this Court's decisions."  *Howes v. Fields*, 132 S. Ct. 1181,

81  182 (2012) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  An "unreasonable

82  application of" those holdings must be "'objectively unreasonable,'" not merely wrong; even

83  "clear error" will not suffice.  *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).  To obtain habeas

84  corpus relief from a federal court, a state prisoner must show that the challenged state-court

85  ruling rested on "an error well understood and comprehended in existing law beyond any

86  possibility for fairminded disagreement."  *Metrish v. Lancaster*, 133 S.Ct. 1781, 1786-87 (2013)

4

87   (citation omitted).

88   ### III.  PROCEDURAL DEFENSES

89     The state raises several procedural defenses, one of which—timeliness—applies to the

90   entire petition.  (*See* Answer 51–55.)  With exceptions not applicable here, federal habeas corpus

91   petitions must be filed within a year of the date that the conviction becomes "final."  28 U.S.C.

92   § 2244(d)(1).  At issue here is  when that one-year clock begins to run; whether the statutory

93   period was tolled by  28 U.S.C. § 2244(d)(2), which stops time during the pendency of a

94   "properly filed application for State post-conviction or other collateral review with respect to the

95   pertinent judgment or claim"; and whether Anderson is entitled to equitable tolling.  The state

96   argues that more than a year of untolled time passed between the end of Anderson's direct appeal

97   and the filing of his federal habeas petition and that it is thus untimely.

98   A. "Finality" Of Judgment

99     Under 28 U.S.C. § 2244(d)(1)(A), the one-year clock generally begins to run on "the date

100  on which the judgment became final by the conclusion of direct review or the expiration of the

101  time for seeking such review."  For prisoners who pursue a full round of direct appeal review, "a

102  state court criminal judgment is 'final' (for purposes of collateral attack) at the conclusion of

103  review in the United States Supreme Court or when the time for seeking certiorari review

104  expires."  *Kapral v. United States*, 166 F.3d 565, 575 (3d Cir. 1999).  For those who do not, the

105  judgment becomes final when the time for seeking additional state review has fully run.

106  *Gonzalez v. Thaler*, 132 S. Ct. 641, 653–54 (2012).

107    As mentioned above, the Appellate Division handed down its direct appeal opinion on

108  November 20, 2003.  Anderson's counseled petition for certification was dated January 20, 2004,

109    61 days later, which is 41 days after it was due under the New Jersey Court Rules. *See* N.J. Ct.

110    R. 2:12-3(a) (2004) (setting out a 20 day period for petitioning).[2]   Anderson's appellate counsel

111    represented that the filing was "delayed because the Office of the Public Defender did not

112    receive a copy of the written decision of the Superior Court of New Jersey, Appellate Division,

113    until the time limit had expired." (Driscoll Cert. ¶ 2 [D.E. 21-26].)   Counsel requested that the

114    New Jersey Supreme Court accept the tardy petition for certification *nunc pro tunc.*

115       The New Jersey Supreme Court's short order denying the petition for certification did not

116    say whether the denial was on the merits of the petition or was due to its untimeliness.   If the

117    New Jersey Supreme Court accepted the petition for review out of time and reached its merits,

118    Anderson's conviction would be "final" July 26th, 90 days after the April 26, 2004 denial.[3]   *See*

119    *Jimenez v. Quarterman*, 555 U.S. 113, 121 (2009) (holding that restoration of direct appeal out

120    of time resets the "finality" date).   But if the Court intended to deny the petition because it was

121    untimely pursued, Anderson's conviction would instead be "final" for AEDPA purposes on

122    December 10, 2003, when the time to petition for certification actually expired.

123       Although the record is ambiguous, the balance of equities favors the view that the New

124    Jersey Supreme Court accepted the out-of-time certification petition and denied it on the merits.

125    First, under the framework applicable in New Jersey at the time, *nunc pro tunc* relief would have

126    been afforded to an indigent criminal defendant like Anderson who requested that a petition for

127    certification be filed, but whose petition was not timely pursued through no fault of his own.   *See*

---

[2] This also falls after the time had run for seeking a 30-day extension. *See* N.J. Ct. R. 2:4-4(a) (2004).

[3] The state repeatedly refers to the decision as being handed down on April 22, 2004, which would instead lead to a July 21, 2004 finality date (July 25 was a Sunday). (*See, e.g.*, Answer 4, 53.) While it is true that the New Jersey Supreme Court decided to deny the certification petition on April 22, the record reflects that the decision was not filed until April 26. Under United States Supreme Court Rule 13(1), the date of entry, not the date of decision, controls.

128   *State v. Altman*, 181 N.J. Super. 539, 541 (App. Div. 1981) ("[T]he sole determinant on a motion

129   by an indigent criminal defendant for leave to file a notice of appeal *nunc pro tunc* is whether

130   that defendant asked either private counsel or a Public Defender, within time, to file such a

131   notice for him."), *modified in part as stated in State v. Molina*, 187 N.J. 531, 542 (2006).

132   Second, orders of the New Jersey Supreme Court can reflect separate dispositions on requests for

133   extensions of time and rulings on the merits of a petition for certification or leave to appeal,

134   which demonstrates that the Court will distinguish between the merit-based and procedural

135   components of its summary decisions.  Finally, the state is the party best positioned to show by

136   reference to the New Jersey Supreme Court's docket if the circumstances are to the contrary, but

137   it has not done so.

138        Accordingly, the Court will deem July 26, 2004, to be the date that Anderson's judgment

139   of conviction became "final" for the purposes of determining the timeliness of his federal habeas

140   petition.

141   B.  <u>Statutory Tolling</u>

142        Anderson filed two New Jersey PCR petitions.  Because a "properly filed" PCR petition

143   tolls the AEDPA one-year filing deadline, *see* 28 U.S.C. § 2244(d)(2), the Court must determine

144   whether both PCR petitions were properly filed and, if so, for how long they tolled the clock.

145        The first PCR petition was filed on February 15, 2005.[4]  Because the parties agree that it

146   was properly filed, it tolled the AEDPA clock until May 6, 2008.

---

[4] In both his amended federal habeas petition and accompanying brief, Anderson references a
June 24, 2004 filing date.  (*See, e.g.*, Am. Pet. 2.)  In his reply, Anderson says that he
"originally" filed his first PCR petition on June 25, but "it went unnoticed."  (Reply 20 [D.E.
24].)  A letter from attorney Brian Driscoll addressed to the Office of the Public Defender [D.E.
25-5] reflects that Anderson reported having "sent his forms via certified mail" on that date, but
it is not apparent from the context whether the "forms" in question are those to obtain

147          The state disputes whether the second PCR petition, filed on September 24, 2008 and

148     decided after the federal habeas petition was filed, also tolled the limitations period.  In fact, the

149     state omits the second PCR petition from its timeliness recitation entirely.  (*See* Answer 53–55.)

150     In the petition, Anderson alleged both trial counsel's ineffectiveness (on several grounds) and

151     judicial misconduct.  The trial judge denied relief partly on non-timeliness procedural grounds—

152     such as the petition's failure to comply with requirements for second and successive petitions

153     (N.J. Ct. R. 3:22-4(b)) and its invocation of grounds already adjudicated (N.J. Ct. R. 3:22-5)—

154     but also appeared to reach the merits of certain claims.  Anderson did not appeal that decision.

155          A state post-conviction application is "properly filed" when "its delivery and acceptance

156     are in compliance with the applicable laws and rules governing filings."  *Artuz v. Bennett*, 531

157     U.S. 4, 8 (2000).  Further, "time limits, no matter their form, are 'filing' conditions," *Pace v.*

158     *DiGuglielmo*, 544 U.S. 408, 417 (2005), even if they operate as affirmative defenses, *Allen v.*

159     *Siebert*, 552 U.S. 3, 6–7 (2007) (per curiam).  If a state court fails "to rule clearly on the

160     timeliness of an application, a federal court 'must . . . determine what the state courts would have

161     held in respect to timeliness.'"  *Jenkins*, 705 F.3d at 86 (quoting *Evans v. Chavis*, 546 U.S. 189,

162     198 (2006)).[5]

---

representation from the public defender's office or whether the "form" was the PCR petition itself.  Because nothing else is provided to support Anderson's contention that the PCR petition was "properly filed" with the court until February, the Court will use the later date.

[5] Both *Evans* and its predecessor case, *Carey v. Saffold*, 536 U.S. 214 (2002), focused more precisely on whether untimely original writs in California's unique post-conviction "appeal" structure rendered the time between original actions "pending" for tolling purposes.  *See Banjo v. Ayers*, 614 F.3d 964, 968 (9th Cir. 2010) (discussing California's "unusual system of independent collateral review").  The Court understands the language quoted above from *Jenkins* to permit applying the same analysis to whether, in more traditional venues like New Jersey, the collateral application was "properly filed" in the first place, although *Jenkins* itself dealt with an appeal and not an original filing.  Other courts have similarly concluded.  *See, e.g.*, *Walton v.*

163            At the time Anderson filed his second PCR petition, N.J. Ct. R. 3:22-12(a) provided:

164            A petition to correct an illegal sentence may be filed at any time.  No other
165            petition shall be filed pursuant to this rule more than five years after rendition of
166            the judgment or sentence sought to be attacked unless it alleges facts showing that
167            the delay beyond said time was due to defendant's excusable neglect.

168    The five-year time limit "commences upon the entry of the judgment at issue, not the conclusion

169    of direct appellate review."  *Engel v. Hendricks*, 153 F. App'x 111, 112 n.2 (3d Cir. 2005)

170    (nonprecedential) (citing *State v. Mitchell*, 126 N.J. 565, 574–77 (1992)).

171            Here, judgment was entered in December 2001; September 2008 is more than five years

172    later.  Nothing about the second PCR petition suggested that it was being filed late due to

173    excusable neglect.  Because it was untimely, it was not "properly filed" under 28 U.S.C.

174    § 2244(d)(2), and thus did not serve to toll the AEDPA limitations period.

175            Anderson would fare the same under the present version of the New Jersey rule, which

176    sets an additional one-year limitations period running from the latest of:

177            (A) the date on which the constitutional right asserted was initially recognized by
178            the United States Supreme Court or the Supreme Court of New Jersey, if that
179            right has been newly recognized by either of those Courts and made retroactive by
180            either of those Courts to cases on collateral review; or
181
182            (B) the date on which the factual predicate for the relief sought was discovered, if
183            that factual predicate could not have been discovered earlier through the exercise
184            of reasonable diligence; or
185
186            (C) the date of the denial of the first or subsequent application for post-conviction
187            relief where ineffective assistance of counsel that represented the defendant on the
188            first or subsequent application for post-conviction relief is being alleged.
189
190    N.J. Ct. R. 3:22-12(a)(2) (2014).  The second PCR petition does not fit into any of these

191    categories.

---

*Sec'y, Fla. Dep't of Corr.*, 661 F.3d 1308, 1312 (11th Cir. 2011) (citing *Walker v. Martin*, 131 S.
Ct. 1120, 1129 (2011), for the proposition that a state's time bar should be respected even if a
state court bypasses the timeliness assessment and denies on the merits), *cert. denied*, 133 S. Ct.
186 (2012).

192     The Court finds further support in *Chisolm v. Ricci*, No. 10-2900, 2013 WL 3786306

193  (D.N.J. July 18, 2013) (Pisano, J.), *certificate of appealability denied*, C.A. No. 13-3409 (3d Cir.

194  order entered Oct. 21, 2013).[6]  There the state argued that a second PCR petition did not toll the

195  limitations period.  *Id.* at *2, 6.  The state courts had not commented on the timeliness question,

196  and had in fact bypassed it.  *Id.* at *6.  The district court found that, under both the old and

197  current N.J. Ct. R. 3:22-12, the second PCR petition was untimely, and thus § 2244(d)(2) tolling

198  was unavailable. *Id.* at *7.  This record compels the same conclusion.

199  C.  Equitable Tolling

200  Equitable tolling is available if a petitioner shows that he has been pursuing his rights diligently

201  and that some extraordinary circumstance prevented his untimely filing.  *Holland v. Florida*, 560

202  U.S. 631, 649 (2010).  The obligation of showing "reasonable diligence" extends to the periods

203  during which the petitioner is exhausting state-court remedies.  *LaCava v. Kyler*, 398 F.3d 271,

204  277 (3d Cir. 2005).  Courts "should be sparing in their use of this doctrine . . . applying equitable

205  tolling only in the rare situation where it is demanded by sound legal principles as well as the

206  interests of justice."  *Id.* at 275 (internal quotation marks, citations, & alterations omitted).

207     Although Anderson does not request equitable tolling by name, the Court liberally

208  construes the opening pages of his reply brief as making the argument.  Apparently, on August

209  20, 2009, the state trial judge issued an order finding "good cause" to assign the services of a

210  public defender to assist with Anderson's second PCR petition.  Although his order is not part of

211  the record, a letter from Stefan Van Jura, Assistant Deputy Public Defender of the Post-

212  Conviction Relief Unit, sets forth that the office had received a "good cause" appointment under

---

[6] In its order denying a certificate of appealability, the Third Circuit panel determined that jurists of reason could debate part of the *Chisolm* decision that discussed equitable tolling.  As discussed further *infra*, no tolling is warranted here.

213  N.J. Ct. 3:22-6(b), but that the order was unexplained.  (*See* Aug. 26, 2009 Letter [D.E. 25-2].)

214  In December 2009, Van Jura sent another letter requesting clarification of the counsel-

215  assignment order "in light of Mr. Anderson's previous PCR proceedings."  (Dec. 8, 2009 Letter

216  [D.E. 25-4].)  In early January, Van Jura wrote to Anderson and said, in effect, that the trial

217  judge "ha[d] not decided the threshold matter of" good cause.  (Jan. 29, 2010 Letter [D.E. 25-3].)

218  In the eventual opinion, issued in July 2010, the court found "no good cause entitling the

219  assignment of counsel."

220          Regardless of the confusion this might have caused, equitable tolling is unavailable

221  because the back-and-forth about counsel appointment *followed*, rather than preceded

222  Anderson's federal habeas petition. To the extent that equitable tolling could apply to the initial

223  confusion regarding the filing of Anderson's first PCR petition, discussed in footnote 6 *supra*,

224  the Court finds that the record demonstrates neither the diligence nor the extraordinary

225  circumstances required for equitable tolling.  Accordingly, no equitable tolling of the AEDPA

226  time limit applies.

227  D.  Calculation of Time Before Federal Filing

228          Following from the above, the Court calculates as follows.  Anderson's conviction was

229  "final" for § 2244(d)(1) purposes on July 26, 2004.  He filed his first PCR petition on February

230  15, 2005, stopping time after **204** days.  The clock restarted on May 6, 2008, and ran until

231  (giving Anderson the benefit of the federal prisoner mailbox rule) the federal petition was filed

232  on March 11, 2009, **309** days later.  Thus, a total of **513** days elapsed before Anderson filed his

233  federal habeas petition, rendering it untimely under the statute.

234  E.  Remaining Procedural Defenses

11

235    A Court may under AEDPA deny a mixed petition on the merits, notwithstanding default

236    or failure to fully exhaust, pursuant to 28 U.S.C. § 2254(b)(2).  *See McLaughlin v. Shannon*, 454

237    F. App'x 83, 86 (3d Cir. 2011) (nonprecedential per curiam); *Turner v. Artuz*, 262 F.3d 118, 122

238    (2d Cir. 2001).  Given the complexity of the procedural issues, the Court addresses the

239    substantive claims in Anderson's petition.

240    **IV.  MERITS**

241    Initially, the Court notes that, in support of his petition to this Court, Anderson relies on

242    the brief his prior counsel filed on direct appeal of his conviction.  This complicates this Court's

243    habeas review, because the appellate brief is not written with the federal habeas standard of

244    review in mind.  In light of his *pro se* status the Court liberally construes Anderson's pleadings..

245    A.  Peremptory Challenges

246    Ground One of Anderson's amended petition presents a claim under *Batson v. Kentucky*,

247    476 U.S. 79, 96 (1986), challenging "the state court's ruling that the prosecutor properly

248    exercised his peremptory challenges when he excused twelve (12) jurors of the African

249    American race [, with] the thirteen (13) challenges he [exercised]."  (Am. Pet. 12.)   The Court

250    construes Anderson's claim as contending that the Appellate Division's decision on direct appeal

251    was contrary to Supreme Court precedent and an unreasonable determination of the facts.

252    The Equal Protection Clause of the Fourteenth Amendment "forbids the prosecutor to

253    challenge potential jurors solely on account of their race or on the assumption that black jurors as

254    a group will be unable impartially to consider the State's case against a black defendant."

255    *Batson*, 476 U.S. at 89 (1986).  The Supreme Court has set forth a three-step analysis for a

256    *Batson* challenge:

12

257        First, the trial court must determine whether the defendant has made a prima facie
258        showing that the prosecutor exercised a peremptory challenge on the basis of race.
259        Second, if the showing is made, the burden shifts to the prosecutor to present a
260        race-neutral explanation for striking the juror in question . . . .  Third, the court
261        must then determine whether the defendant has carried his burden of proving
262        purposeful discrimination.  This final step involves evaluating "the persuasiveness
263        of the justification" proffered by the prosecutor, but "the ultimate burden of
264        persuasion regarding racial motivation rests with, and never shifts from, the
265        opponent of the strike."

266

267 *Rice v. Collins*, 546 U.S. 333, 338 (2006) (citations omitted).

268        Establishing a prima facie case at step one requires a defendant to show that "the totality

269 of the relevant facts gives rise to an inference of discriminatory purpose."  *Johnson v. California*,

270 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 93–94).  The defendant may proffer

271 evidence that the government exercised a "'pattern' of strikes against black jurors included in the

272 particular venire, [which] might [then] give rise to an inference of discrimination."  *Williams v.*

273 *Beard*, 637 F.3d 195, 214 (3d Cir. 2011) (quoting *Batson*, 476 U.S. at 97).  In addition, "the

274 prosecutor's questions and statements during *voir dire* examination and in exercising his

275 challenges may support or refute an inference of discriminatory purpose."  *Id.*

276        The government's burden of production at step two is relatively low; "[u]nless a

277 discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be

278 deemed race neutral."  *Williams,* 637 F.3d at 215 (quoting *Purkett v. Elm*, 514 U.S. 765, 768

279 (1995) (per curiam)).  Moreover, although the prosecutor must present a comprehensible reason,

280 "[t]he second step of this process does not demand an explanation that is persuasive, or even

281 plausible"; so long as the reason is not inherently discriminatory, it suffices.  *Purkett*, 514 U.S. at

282 767-768.

283        At step three, the defendant must show that "it is more likely than not that the prosecutor

284    struck at least one juror because of race." *Hairston v. Hendricks*, 2014 U.S. App. LEXIS 17054

285    (3d Cir. N.J. Sept. 3, 2014) (quoting *Bond v. Beard*, 539 F.3d 256, 264 (3d Cir. 2008)). *Williams,*

286    637 F.3d at 215 (citation omitted). "Step three of the *Batson* inquiry involves an evaluation of

287    the prosecutor's credibility, and the best evidence [of discriminatory intent] often will be the

288    demeanor of the attorney who exercises the challenges." *Snyder v. Louisiana*, 552 U.S. 472, 477

289    (2008) (alteration in original) (internal citations and quotation marks omitted).  At this step, "all

290    of the circumstances that bear upon the issue of racial animosity must be consulted."  *Id.* at 478.

291        In this case, the prosecutor exercised 13 peremptory challenges, removing 12 African-

292    Americans and one Caucasian. The final jury included six African-American jurors, which

293    represented 40% of the 15 sitting jurors.  (Dir.App.Op. 7–8.)  The record shows that, at the close

294    of jury selection, all parties agreed that the jury was satisfactory.  But before the jury was to be

295    sworn, the attorney representing Anderson's co-defendant Dawara requested a mistrial on the

296    ground that the State's exercise of its peremptory challenges was discriminatory because all but

297    one of its 13 challenged jurors were African-American.  (Dir.App.Op. 7.)  The trial judge found

298    that Dawara had established a prima facie case under step one, heard the reasons proffered by the

299    prosecutor,[7] and ultimately determined that Dawara had failed to establish by a preponderance of

---

[7] The prosecutor's explanations included factors such as "(1) juror's difficulty in understanding
the nature of the criminal charges in the case at bar; (2) a juror's failure to report a serious crime
committed against him; (3) a juror's relationship with a boyfriend who had just been released
from jail; (4) a juror's intimate relationship with the father of her daughter who had been
convicted and incarcerated in Union County; (5) inappropriate contact with defendant by a juror
sitting in the box; and (6) other challenges relating to certain jurors who exhibited potential
biases against the State, *e.g.*, a sister charged with falsifying prescriptions who had been
exonerated, and a recent conviction for DWI in Essex County."  (Dir.App.Op. 12.)

300    the evidence that the prosecutor had exercised a peremptory challenge in a racially

301    discriminatory manner.  *Id.* at 8.

302           Anderson made a *Batson* claim on direct appeal, arguing that the trial court erred in

303    denying the mistrial where the prosecutor had offered non-discriminatory reasons as to only

304    seven out of the 12 African-American jurors.  (App. Div. Br. 29–33 [D.E. 21-23].)  The

305    Appellate Division applied the three-step *Batson* standard.  (Dir.App.Op. 9–14.)  It agreed with

306    the trial court that step one of the *Batson* analysis was satisfied.[8]  As for step two, although the

307    prosecutor was unable to recall his reasons for striking five of the African-American jurors, the

308    Appellate Division concluded that "this was due in part to the time gap between the selection of

309    the jury and the co-defendant's request for a mistrial."  (Dir.App.Op. 8.)  Specifically the

310    Appellate Division found that defense counsel "should have challenged each selection

311    immediately after the State's decision during the empanelling and not at the conclusion of the

312    jury selection, which had taken a number of days, interrupted by a three-day weekend, and after

313    both sides had found the jury satisfactory."  (Dir.App.Op. 8.)  The Appellate Division also

314    agreed with the trial judge's step three finding that the defendant had not shown by a

315    preponderance of the evidence that the totality of the circumstances showed that the prosecutor

316    struck any juror on account of race.  (Dir.App.Op. 8.)

---

[8] In its analysis, the Appellate Division did not discuss how many members of the venire panel were African-American.  While this factor is relevant to the step one analysis, *see Miller-El v. Dretke* 545 U.S. 231, 240–41 (2005), omission of this factor is not troubling here in light of the court's conclusion that step one was satisfied.  Further, the Appellate Division relied in part on *State v. Gilmore*, 103 N.J. 508 (1986), which has been expressly disfavored as establishing an overly severe "first prong" threshold, which was incompatible with *Batson*.  *See Clausell v. Sherrer*, 594 F.3d 191, 194 (3d Cir. 2010) (citing *State v. Osorio*, 199 N.J. 486, 502–03 (2009)). This is of no moment for the same reason.

317    The contours of Anderson's *Batson* challenge before this Court are not clear from his

318 amended petition and appellate brief.  Presumably, he is contending that the Appellate Division

319 unreasonably applied *Batson* by (a) failing to find in his favor at step two when the prosecutor

320 was not able to recall why he struck five African-American jurors, and (b) by ruling against him

321 at step three.

322    (1) Was the failure to terminate the inquiry at step two contrary to, or an unreasonable
323      application of, clearly established Supreme Court precedent?
324
325    There does not appear to be a Supreme Court case precisely addressing whether a court

326 should proceed to step three when, at step two, the prosecutor is unable to recall the reason he or

327 she exercised a peremptory challenge against a particular juror.  But several Supreme Court and

328 Third Circuit cases are relevant to the issue.  For example, in *Purkett v. Elem*, 514 U.S. 765

329 (1995) (per curiam), the Supreme Court emphasized that the persuasiveness of the prosecutor's

330 justification for a particular strike does not become relevant until step three:

331    At that stage, implausible or fantastic justifications may (and probably will) be
332    found to be pretexts for purposeful discrimination.  But to say that a trial judge
333    *may choose to disbelieve* a silly or superstitious reason at step three is
334    quite different from saying that a trial judge *must terminate* the inquiry at step two
335    when the race-neutral reason is silly or superstitious.  The latter violates the
336    principle that the ultimate burden of persuasion regarding racial motivation rests
337    with, and never shifts from, the opponent of the strike.
338
339 *Id.* at 768 (emphasis in original).

340    In *Johnson v. California*, 545 U.S. 162 (2005), the Supreme Court reversed the California

341 Supreme Court's determination that the defendant had not established a prima facie case under

342 *Batson* where California "require[d] at step one that the objector must show that it is more likely

343 than not the other party's peremptory challenges, if unexplained, were based on impermissible

344 group bias."  *Id.* at 168 (citation and internal quotation marks omitted).  The Court emphasized

16

345    that "a defendant satisfies the requirements of *Batson's* first step by producing evidence

346    sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Id.* at

347    170.  However, in rejecting California's contention that a prosecutor's failure to respond to a

348    prima facie case would entitle a defendant to judgment as a matter of law on the basis of nothing

349    more than an inference that discrimination may have occurred, the Supreme Court noted that a

350    case proceeds to step three even if the State produces at step two "only a frivolous or utterly

351    nonsensical justification" for its strike.  *Id.* at 171.  In a footnote, the Court added:

352            In the unlikely hypothetical in which the prosecutor declines to respond to a trial
353            judge's inquiry regarding his justification for making a strike, the evidence before
354            the judge would consist not only of the original facts from which the prima facie
355            case was established, but also the prosecutor's refusal to justify his strike in light
356            of the court's request.  Such a refusal would provide additional support for the
357            inference of discrimination raised by a defendant's prima facie case.

358

359    *Id.* at 171 n.6.

360         In *Lark v. Secretary Pennsylvania Department of Corrections*, 645 F.3d 596 (3d Cir.

361    2011), the Third Circuit considered whether a court hearing a *Batson* challenge should terminate

362    the inquiry at step two, or proceed to step three, where the prosecutor is unable to recall why he

363    or she struck a juror.[9]  Lark filed a § 2254 petition in which he claimed that the Commonwealth

364    of Pennsylvania violated *Batson* where the prosecutor used 13 out of 15 peremptory strikes

365    against African-Americans and the jury was ultimately composed of four African-Americans and

366    eight Caucasians.  The district court conducted an evidentiary hearing on the *Batson* claim

367    several years later, and the prosecutor could not remember why he struck three out of 13

368    African-American jurors.  The district court granted a § 2254 writ on the *Batson* claim because

369    the state failed to meet its duty of production at step two.

---

[9]  Although this case was not governed by the AEDPA standard, its reading of Supreme Court precedent is instructive here.

370     The Third Circuit reversed and remanded.  Citing footnote 6 in *Johnson*, the *Lark* panel

371 reasoned that the prosecutor's failure to explain his reasons "is not, by itself, of such dispositive

372 force that it establishes that there was a *Batson* violation."  *Id*. at 625.  Emphasizing that "the

373 Supreme Court in *Johnson* rejected the argument that a prosecutor's failure to respond to a prima

374 facie case 'would inexplicably entitle a defendant to judgment as a matter of law on the basis of

375 nothing more than an inference that discrimination may have occurred,'" *id*. at 626 (quoting

376 *Johnson*, 545 U.S. at 170), the court held that a prosecutor's "inability to explain the reasons for

377 his use of three peremptory challenges at the second step of the *Batson* analysis was not a

378 sufficient ground to grant the conditional writ of habeas corpus because that inability along with

379 the other information available to the District Court did not enable [petitioner] to satisfy his

380 ultimate burden of proving intentional discrimination."  *Id*. at 621.

381     This year in *Hairston v. Hendricks*, the Third Circuit rejected petitioner's argument that

382 the trial judge did not reach the necessary third step of the *Batson* analysis, finding that the trial

383 judge was "well equipped to make a finding about whether he believed the reasons given by the

384 prosecutor for exercising the state's strikes were a pretext for discrimination."  *Id.* at 27. While

385 not directly on-point, *Hairston* supports the proposition that where the trial court has enough

386 information to determine the validity of the prosecutor's reasons for dismissing a juror, it may

387 continue to the third step in the *Batson* analysis even if the prosecutor's reasons are suboptimal.

388     In Anderson's case, the Appellate Division's decision not to terminate its analysis at step

389 two was not contrary to, or an unreasonable application of, *Batson* and its progeny.  Consistent

390 with *Batson*, and the dicta in *Johnson,* the Appellate Division proceeded to step three, even

391 though the prosecutor could not recall why he struck five African-American jurors.  In other

18

392    words, that the Appellate Division did not outright reject the prosecutor's response did not

393    offend the *Batson* protocol.  Because *Purkett* requires only that the proffered reason be

394    comprehensible, and because footnote 6 in *Johnson* suggests that even if a prosecutor's refusal to

395    respond at step two is not conclusive, and because there is no Supreme Court holding requiring a

396    court to terminate the *Batson* analysis at step two under certain circumstances, this Court cannot

397    find that the Appellate Division's failure to terminate the inquiry at step two was contrary to, or

398    an unreasonable application of, clearly established Supreme Court precedent.  Thus, Anderson is

399    not entitled to habeas corpus relief under § 2254(d)(1) based upon the Appellate Division's

400    failure to terminate its analysis at step two.

401
402          (2) Did the Appellate Division's step three inquiry satisfy the requirements of Section
403               2254(d)?

404        AEDPA outlines two grounds for consideration under § 2254(d).  The first, § 2254(d)(1),

405    considers whether the court's *legal* conclusions were contrary to clearly established Supreme

406    Court precedent; the second, § 2254(d)(2), considers whether the court made an unreasonable

407    determination of the *facts* given the evidence presented.  The Court considers each section in

408    turn.

409        Once it found the prosecutor had satisfied his burden of production at step two of the

410    *Batson* analysis, the Appellate Division moved to step three, evaluating the strength of the

411    prosecutor's explanations.  The prosecutor gave six enumerated reasons, justifying excusing

412    seven jurors, described in footnote 7 *supra*.  The Appellate Division then found that the

413    prosecutor excused "several young jurors who did not appear to understand the severity of the

414    case," and that part of what motivated the prosecutor overall was "how the jurors sitting in the

415    box appeared as a whole."  (Dir.App.Op. 12-13.)  The Appellate Division found that the

416    prosecutor was looking for "strong" jurors, and excused jurors who "seemed reticent and might

417    be a weak voice in the jury room." (Dir.App.Op. 13.)  Ultimately, the Appellate Division found

418    that the trial court's reasoning was sufficient, and that the prosecutor's reasons for excluding

419    individual jurors were "race-neutral, individualized to their particular circumstances and

420    experiences, and reasonably relevant to the case on trial."  *Id.*

421         According to Supreme Court precedent, to discredit a prosecutor's race-neutral reasons

422    proffered at step two of the *Batson* inquiry, and thereby establish purposeful discrimination at

423    step three, a petitioner must show that the race-neutral reasons are not credible.  *See Miller-El v.*

424    *Dretke*, 545 U.S. 231, 247 (2005) (stating that a "prosecutor's explanations cannot be reasonably

425    accepted" when they are not credible).  Credibility can be measured by "how reasonable, or how

426    improbable, the explanations are."  *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).  The

427    Appellate Division's step three analysis considered the reasons given by the prosecutor for

428    excluding potential jurors and considered the prosecutor's conduct as a whole to determine the

429    credibility of his assertions pursuant to *Snyder v. Louisiana*, 552 U.S. at 477.  Thus, the

430    Appellate Division decision was not contrary to, or an unreasonable application of, clearly

431    established Supreme Court precedent.  *See Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011)

432    (per curiam) (reversing the Ninth Circuit's opinion granting relief on *Batson* claim where the

433    state trial court credited the prosecutor's explanations at step three, and the appeals court

434    carefully reviewed the record and upheld the trial court's determination).  Anderson is not

435    entitled to habeas relief under § 2254(d)(1) based upon the Appellate Division's findings at step

436    three.

437       To grant relief under § 2254(d)(2), this Court would have to find that the Appellate

438   Division's conclusion that the prosecutor did not strike any African-American jurors based on

439   race was "an unreasonable determination of the facts in light of the evidence presented in the

440   State court proceeding."  28 U.S.C. § 2254(d)(2).  The very language of the statute goes on to

441   erect a significant hurdle that Anderson fails to overcome:  "[A] determination of a factual issue

442   made by a state court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  The Appellate

443   Division's finding (affirming the trial judge) that the prosecutor's peremptory strikes were not

444   motivated by race is "a pure issue of fact accorded significant deference."  *Hernandez v. New*

445   *York*, 500 U.S. 352, 364 (1991) (plurality opinion).  This finding must be presumed correct

446   unless Anderson shows by clear and convincing evidence that it is not.  See 28 U.S.C. §

447   2254(e)(1).

448       Anderson argues that the reasons the prosecutor gave for striking seven African-

449   American jurors were "bogus" and, "[s]ince all TWELVE (12) of the prosecutor's peremptory

450   challenges w[ere] the focus . . . , the prosecutor should have advanced reasons for excusing all

451   (12) and not just for seven (7) which all but one of his reasons had any merit."  (Reply 13.)

452       Under the exacting legal burden imposed on him, Anderson would need far more than he

453   has shown.  "Reasonable minds reviewing the record might disagree about the prosecutor's

454   credibility, but on habeas review that does not suffice to supersede the trial court's credibility

455   determination."  *Rice v. Collins*, 546 U.S. 333, 341–42 (2006).

456       This Court has already found that the Appellate Division's finding that the failure to give

457   reasons was not a *Batson* violation suffices under the applicable standard (and it also suffices

458   based on common sense, inasmuch as defense counsel pronounced themselves satisfied at the

459    close of the jury *voir dire*).  Anderson's bald, conclusory attack on the reasons given does not

460    amount to clear and convincing evidence that would disturb the presumption of correctness.  In

461    light of the evidence presented, thus this Court finds that Anderson is not entitled to habeas relief

462    on his *Batson* claim under § 2254(d)(2).

463    B.  <u>Excessive Sentence</u>

464    Anderson contends in Ground Two that "the State court's ruling that defendant's

465    sentence wasn't disparate and excessive was error."  (Am. Pet. 12.)  Anderson raised this ground

466    in his brief to the Appellate Division on direct appeal.  He compared his sentence of three

467    consecutive terms of 15, 18, and seven years, for a total of 40 years, to the sentence of his

468    codefendant, Hamadi Aaron, who received a total of 15 years for all three separate indictments in

469    exchange for testifying against him.  (App. Div. Br. 34–38.)  Anderson argued on direct appeal

470    that the sentences were disparate, his sentence was excessive compared to Aaron's, and the

471    consecutive nature of his sentence violated state law.  The Appellate Division rejected these

472    arguments and found that the consecutive sentences fell within the appropriate sentencing

473    guidelines.  (Dir.App.Op. 14–15.)

474    Absent a claim that a sentence constitutes cruel and unusual punishment prohibited by the

475    eighth amendment, or that it is arbitrary or otherwise in violation of due process, the legality and

476    length of a sentence are questions of state law over which this Court has no jurisdiction under §

477    2254.  *See Chapman v. United States*, 500 U.S. 453, 465 (1991) (holding that under federal law,

478    "the court may impose . . . whatever punishment is authorized by statute for [an] offense, so long

479    as that penalty is not cruel and unusual, and so long as the penalty is not based on an arbitrary

480    distinction that would violate the Due Process Clause of the Fifth Amendment").  Anderson's

22

481    claim that his sentence is disproportionate to that of his co-defendant is resolved by *Lockyer v.*

482    *Andrade*, 538 U.S. 63 (2003), where the Supreme Court observed that the eighth amendment's

483    gross disproportionality principle "reserves a constitutional violation for only the extraordinary

484    case." *Id.* at 77.  This is not such a case, particularly where Aaron pleaded guilty, accepting

485    responsibility for his crimes.  Habeas relief is denied on the sentencing claims.

486    C.  Ineffective Assistance of Counsel

487         In Grounds Three, Five, Six, Seven, Eight and Nine, Anderson claims that counsel was

488    constitutionally ineffective for failing to present an alibi witness (Latesha Anderson ("Latesha")),

489    failing to establish that the evidence from the robberies was found on his co-defendant (instead

490    of the car's center console), failing to request a *Wade* hearing on the show-up identification,

491    failing to conduct a background check on the witnesses and victims, failing to establish that

492    Anderson had not met Hamadi Aaron until the day of his arrest, and failing to cross examine

493    Aaron about the alleged motive they had for committing the robberies.[10]  (Am. Pet. 13–18.)

494         The Sixth Amendment, applicable to states through the due process clause of the

495    fourteenth amendment, guarantees the accused the "right . . . to have the Assistance of Counsel

496    for his defense."  U.S. Const. amend. VI.  A claim that counsel's assistance was so defective as

497    to require reversal of a conviction has two components, both of which must be satisfied.  *See*

498    *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The defendant must "show that counsel's

499    representation fell below an objective standard of reasonableness" and that the specified errors

500    resulted in prejudice.  *Id.* at 687–88.  To establish prejudice, the defendant must "show that there

501    is a reasonable probability that, but for counsel's unprofessional errors, the result of the

---

[10] Anderson raises additional grounds in his reply brief.  This Court will not consider those new
grounds, as they were not included in Anderson's all-inclusive amended petition.

502     proceeding would have been different." *Id*. at 694 (citations omitted).  The reasonable

503     probability standard is less demanding than the preponderance of the evidence standard.  *See Nix*

504     *v. Whiteside*, 475 U.S. 157, 175 (1986); *Baker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999).

505             Habeas review of a state court's adjudication of an ineffective assistance claim is "doubly

506     deferential."  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  To obtain habeas relief, a state

507     petitioner "must demonstrate that it was necessarily unreasonable for the [state c]ourt to

508     conclude:  (1) that [petitioner] had not overcome the strong presumption of competence; and (2)

509     that he failed to undermine confidence in the [outcome]."  *Cullen*, 131 S. Ct. at 1403.

510             Anderson presented his ineffective assistance of counsel claims to the Appellate Division

511     in his appeal from the order denying his PCR petition.  The Appellate Division rejected the

512     claims substantially for the reasons articulated in trial judge's 33-page oral opinion denying the

513     PCR petition. *See Anderson*, 2008 WL 695864, at *1.  The court found that counsel was not

514     deficient for failing to call Latesha because Anderson had not submitted an affidavit (or anything

515     else) setting forth what she would have said.  In addition, even if Latesha had testified, the trial

516     court determined the outcome would not have changed, given Hamadi Aaron's testimony.

517     (PCR.Tr. 6–9 [D.E. 21-19].)  The trial judge further found that Anderson failed to show

518     prejudice resulting from claimed errors about (1) counsel's failure to establish that the evidence

519     (from the robberies) was on the person of co-defendant Aaron, (2) counsel's failure to conduct

520     background checks, (3) counsel's failure to show that Anderson did not know Aaron until the

521     day of their arrest, and (4) failure to cross-examine Aaron on his motive for the robberies. .

522     (PCR.Tr. 23–30.)

523     In his long opinion, the trial judge  inadvertently failed to discuss Anderson's claim that

524 counsel ineffectively failed to request a hearing under *United States v. Wade*,, 388 U.S. 218

525 (1967).[11]  Anderson's brief to the Appellate Division raised the claim, and provided no analysis

526 of the prejudice prong.  (App. Div. PCR Br. 17 [D.E. 21-31].)  This case did not hinge on

527 identity, since the police arrested Anderson and his co-defendants with the vehicle that was used

528 in the robberies shortly after the second robbery.  In light of Aaron's testimony and the

529 undisputed fact that three males committed the robberies by using a specific car and the police

530 thereafter arrested the three defendants with that car, Anderson has failed to establish that there is

531 a reasonable probability that the outcome would have been different if counsel had requested a

532 *Wade* hearing.

533     The trial court's rejection of these claims as deficient because Anderson failed to show

534 prejudice was proper under *Strickland* and even inevitable, given Hamadi Aaron's testimony and

535 the first victim's identification of the car driven by the three men who robbed his store.

536 Anderson has not shown that the New Jersey courts' rejection of his ineffective assistance of

537 counsel claims, essentially for failure to establish prejudice, was contrary to, or an unreasonable

538 application of *Strickland* or other Supreme Court precedent.  As held in *Strickland*, 466 U.S. at

539 697, "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

540 prejudice, which we expect will often be so, that course should be followed."  Accordingly,

541 Anderson is not entitled to habeas relief.

542 D.  <u>Admission of Digital Photos</u>

---

[11] "A *Wade* hearing is conducted when a question arises concerning an identification procedure that has possibly violated a constitutional right.  The hearing is made outside the presence of a jury, and concerns not the in-court identification, but only the pre-trial identification."  *United States v. Stevens*, 935 F.2d 1380, 1386 n.3 (3d Cir. 1991) (citation omitted).

543              In Ground Four, Anderson argues that "the trial court erred in allowing digital

544    photographs as evidence at defendant's trial after the police officer had them stored on his home

545    computer for an entire year." (Am. Pet. 14.) The digital photographs were of the center console

546    of the vehicle in which Anderson and his co-defendants were apprehended, and of the

547    intersection at which police stopped the vehicle. In the console photos, the stolen property is

548    seen in the vehicle console. As factual support for his claim, Anderson states that "the digital

549    images . . . can be easily altered by using a computer and therefore, not admissible," and that

550    their admission was "inappropriate" because the police officer used his own camera and he failed

551    to produce negatives for purposes of authentication. *Id*. at 14–15.

552              Anderson raised this ground as part of an ineffective assistance of counsel claim on

553    appeal from the denial of his PCR petition. The Appellate Division did not discuss the issue in

554    its review, noting that Anderson's "contention his PCR counsel was ineffective is without

555    sufficient merit to warrant discussion in a written opinion," while agreeing with the trial court

556    that Anderson failed to demonstrate prejudice. *Anderson*, 2008 WL 695864, at *2. Anderson's

557    co-defendant Dawara raised this same issue on direct appeal. Because the Appellate Division

558    discussed the merits of the digital photo challenge in Dawara's appeal, this Court will consider

559    the claim as if Anderson had exhausted it himself.

560              The question of the admission of evidence is essentially a state law evidence claim, and

561    "the Due Process Clause does not permit the federal courts to engage in a finely tuned review of

562    the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983).

563    Here, the Appellate Division determined that the digital photos were properly admitted and

564    authenticated under state law. *State v. Dawara*, No. A-3903-03T4, 2006 WL 3782964, at *4–6

565  (App. Div. Feb. 10, 2006).  This Court finds that the New Jersey courts' adjudication of his

566  admission of digital photos claim was not contrary to, or an unreasonable application of, clearly

567  established Supreme Court precedent.

568       E.  <u>Denial of Severance</u>

569       In ground ten, Anderson asserts that he "was denied his right to a separate trial from so-

570  called codefendant Dawara."  (Am. Pet. 18.)  According to the Supreme Court, "[i]mproper

571  joinder does not, in itself, violate the Constitution."  *United States v. Lane*, 474 U.S. 438, 446 n.

572  8 (1986).  Denial of a motion to sever violates due process "only if there is a serious risk that a

573  joint trial would compromise a specific right of . . . the defendant[ ], or prevent a jury from

574  making a reliable judgment about guilt or innocence.  Such a risk might occur when evidence

575  that the jury should not consider against a defendant and that would not be admissible if a

576  defendant were tried alone is admitted against a codefendant."  *Zafiro v. United States*, 506 U.S.

577  534, 539 (1993).  Moreover, "a fair trial does not include the right to exclude relevant and

578  competent evidence."  *Id*. at 540 (citation & internal quotation marks omitted).

579       The first time that Anderson raised this issue was in his PCR petition to the trial court as

580  part of his ineffective assistance of counsel claim.  The Appellate Division affirmed without

581  discussion the trial court's ruling rejecting severance, and so this Court addresses that holding as

582  the last reasoned opinion by the state courts.  The point is worth making here that throughout

583  Anderson's prosecution, the same judge with familiarity and experience with all facets of the

584  case made all the trial level rulings.  Faced with the severance argument arising after the

585  conviction, the trial judge rejected it, holding that even if Anderson had been tried separately, the

586  proofs against him would not have been different and the result would have been the same.

(PCR Tr. 30–32.) Anderson points to no evidence admitted at the joint trial that would not have been admissible if he had been tried alone, and he has not shown that the joinder compromised any specific right or prevented the jury from reliably judging his guilt or innocence.  Thus, joinder of charges did not deny him a fair trial and the trial court's adjudication of the claim was not contrary to, or an unreasonable application of, Supreme Court precedent.

## V.  CONCLUSION

Accordingly, because this petition is untimely and without merit, and because jurists of reason would not debate this, the Court will deny it and will not issue a certificate of appealability.  See 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).  An appropriate order follows.

November 24, 2014                              /s/ Katharine S. Hayden_____
                                               **Katharine S. Hayden, U.S.D.J.**