Maurice Anderson #427620
Lock Bag R      #769537-B
East Jersey State Prison
Rahway, NJ 07062



UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
Docket No. 09-1168

| | |
|---|---|
| MAURICE ANDERSON : | |
| Petitioner-Appellant : | |
| : | CIVIL ACTION |
| v. : | |
| : | APPLICATION FOR A CERTIFICATE |
| MICHELLE RICCI, et als., : | OF APPEALABILITY |
| Respondents-Appellees : | |

Petitioner Maurice Anderson, pro se in the above captioned matter hereby applies for a certificate of appealability ("COA").

## STANDARD FOR GRANTING A COA

28 U.S.C. 2253(c)(1) reads, in pertinent part as follows: Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from--(A) the final order in a habeas corpus proceeding in which the detention complained or arises out of process issued by a State court; or (B) the final order in a proceeding under section 2255.

28 U.S.C. 2253(c)(2) reads, in pertinent part as follows: A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

Miller-El v. Cockrell, 537 U.S. 322, 330-331, 123 S.Ct. 1029, 154

L.Ed.2d 931 (2003) reads, in pertinent part as follows:

A COA will issue only if the requirements of Section 2253 have bee satisfied. "The COA statute establishes procedural rules ad requires a threshold inquiry into whether the circuit court may entertain an appeal." Slack, 529 U.S. at 482; Hohn v. United States, 524 U.S. 236, 248, 141 L.Ed.2d 242, 118 S.Ct. 1969 (1998). As the Court of Appeals observed i this case, Section 2253(c) permits the issuance of a COA only where a petitioner has made a "substantial showing of a denial of a constitutional right." In Slack, supra at 483, we recognized that Congress codified our standard, announced in Barefoot v. Estelle, 463 U.S. 880, 77 L.Ed.2d 1090, 103 S.Ct. 3383 (1983), for determining what constitutes the requisite showing. Under the controlling standard, a petitioner must "show that reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" 529 U.S. at 484 (quoting Barefoot, supra).

The COA determination under Section 2253 requires a overview of the claims in the habeas petition and a general assessment of their merits. We look to the District Court's application of AEDPPA to petitioner's constitutional claims and ask whether that resolution was debatable amongst jurist of reason. This threshold inquiry does not requires full consideration of the factual or legal basis adduced in support of the claims. In fact, the statute forbids it.

To that end, your opinion in Slack held that a COA does not require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application for a COA merely because it believes the application will not demonstrate an entitlement to relief. The holding in Slack would mean very little if appellate review were denied because the prisoner did not convince a judge, or for that matter, three judges, that he or she would prevail. It is consistent with Section 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner "' has already failed in the endeavor.'" (Barefoot)

At issue here are the standards AEDPA imposed before a court of appeals may issue a COA to review a denial of habeas relief in the

2

district court. Congress mandates that a prisoner seeking post-conviction relief under 28 U.S.C. 2254 ha o automatic right to appeal a district court's denial or dismissal of the petition. Instead, petitioner must seek and obtain a COA. In resolving this case we decide again that when a habeas applicant seeks permission to initiate appellate review of a dismissal or denial of his petition, the court of appeals should limit its examination to a threshold inquiry into the underlying merit of his claims. Slack v. McDaniel, 529 U.S. 473, 481 (2000). Consistent with our prior precedent at the text of habeas corpus statute, we reiterate that a prisoner seeking a COA need only demonstrate "a substantial showing of the denial of a constitutional right." 28 U.S.C. 2253(c)(2). Petitioner satisfies this standard by demonstrating that any jurist of reason would disagree with the district court's resolution of his constitutional claims or that jurist could conclude the issues presented are adequate to deserve encouragement to proceed further. Slack, supra, 529 U.S. at 484. Applying these principles to petitioner's application, we conclude a COA should have issued.

The Supreme Court recognized in Slack v. McDaniel, that "a substantial showing" standard for a COA is relatively modest and is the same as the prior standard for issuance of a CPC apart from the requirement that the court identify specific appealable issues. Slack, 529 U.S. at 483, Jennings v. Woodford, 290 F.3d 1006, 1010 (9th Cir. 2002). The primary purpose of the COA requirement is to separate meritless from frivolous appeals. But the COA requires something more than an absence of "frivolitity." It requires a "question of some substance." Barefoot, 463 U.S. at 880, 893.

The Third Circuit requires the applicant to make: "(1) a credible showing that the district court's procedural ruling was incorrect; and (2) a substantial showing that the underlying habeas petition [or motion] alleges a deprivation of constitutional rights" Morris v. Horn, 187 F.3d 333, 340 (3rd Cir. 1999); see also 28 U.S.C. 2253(c)(2) ("A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right."). United Stated v. Potts, 2010 U.S. Dist. Lexis 7440.

3

However, the Third Circuit has stated that the Appellant/Applicant does not have to prove that he is entitled to habeas corpus in order to be entitled to a COA. Pabon v. Superintendent, SCI Mahoy, 654 F.3d 385 (3rd Cir. 2011). The purpose of a COA is to determine whether the issues are debatable, or to resolve them.

## ISSUES THAT ARE DEBATABLE

1. WHETHER THE TRIAL COURT ERRED IN DENYING PETITIONER'S MOTION FOR MISTRIAL AT THE CLOSE OF JURY SELECTION

(RAISED ON DIRECT APPEAL AS POINT ONE)

Petitioner's federal rights were violated when the district affirmed the state court's decision to his Batson claim, where the state utilized 12 of its 13 peremptory challenges on the African American race for a discriminatory purpose. The district court reiterated what the state advanced about all parties (counsel, co-counsel and the state) announced themselves satisfactory at the close of jury selection. The district further stated that the state's explanations for it's challenges included such factors as those listed in her Order on page 14, footnote 7. The very same explanations advanced by the trial prosecutor, and the state in its answer to petitioner's pro se brief which all by one of those explanations had already been discredited. On the day in question (10-16-01, & immediately after jury was satisfactory) the trial court recessed for lunch ad instructed the state to consult its notes on the jury challenges so that they can be examined (3T111-16 to 22).

Subsequently, the state court announced that co-counsel (Ms. Burke) had initially met her burden to show prima facie bias by the fact that all but one of the state's challenges were of the black race or perceived to be of the black race (3T112-18 to 22). During the hearing the hearing the state advanced the following explanations:

(1) Jurors difficulty in understanding the nature of the criminal charges in the case at bar;

(2) A jurors failure to report a serious crime committed against him;

4

(3) A jurors relationship with a boyfriend who had just been released from jail;

(4) A jurors intimate relationship with the father of her daughter who had been convicted and incarcerated in Union County;

(5) Inappropriate contact with defendant by a juror sitting in the jury box; and

(6) Other challenges relating to certain jurors who exhibited potential bias against the state, e.g., a sister falsifying prescriptions who had been exonerated, and a recent conviction for DWI in Essex County.

With respect to explanation #2 (A jurors failure to report a serious crime committed against him) [the only reasonable explanation he'd given] that person had stated that he can still be fair and impartial. Nevertheless, that would have more than likely been a challenge for the defense, since the crime that was committed against the juror was similar to hat the petitioner was on trial for.

With respect to explanation #1 (Jurors difficulty in understanding the nature of the criminal charges in the case at bar), that was cleared up in the matter of seconds at sidebar where the juror advanced she had difficulties understanding the nature of the criminal charges in the case at bar (2T65-4 to 66-2). No further questions was asked of this witness and no other comments were made by the state, the court or of either counsel and she as seated without any objection.

With respect to #3 (A jurors relationship with a boyfriend who had just been released from jail) and #4 (A jurors intimate relationship with the father of her daughter who had been convicted and incarcerated in Union County), was of the same juror and this issue was also cleared-up i the matter of seconds. The juror (Ms. Spivey) stated, "My daughter's father had possession of marijuana, stealing, stuff like that" (2T61-6). She also stated that, "He recently was in jail, and I really, I don't associate with him like that anymore (2T61-24 to 62-1). A far cry from what the prosecutor advanced.

With respect to explanation #5 (Inappropriate contact with defendant by a juror sitting in the jury box) had also bee discredited. The state described her as a young woman whom petitioner was having inappropriate

5

contact with. This juror (Ms. Caroline Dixon) whom the state described as a young lady of tender years, was in fact an elderly lady, retired and married.

With respect to explanation #6 (Other challenges relating to certain jurors who exhibited potential bias against the state, e.g., a sister falsifying prescriptions who had been exonerated, and a recent conviction for DWI in Essex County), the state didn't list any transcript reference in her Answer of where that explanation could be found and petitioner doesn't recall that ever happening. Petitioner argues that his Sixth and Fourteenth Amendment Rights were violated when the district court failed to acknowledge that the state court didn't conduct a proper hearing with respect to his Batson claim (the very same case the district court cited for as its reason for denying petitioner).

The procedural landmark case Batson v. Kentucky, 106 S.Ct. 1712 (1986), proceeds in three steps:

First, the defendant must establish a prima facie case of discriminatory jury selection by the totality of the relevant facts about the prosecutors conduct during the defendant's own trial; Secondly, the state must come forward with a neutral explanation for challenging jurors with an arguably targeted class; and Thirdly, the trial court then will have the duty to determine if the defendant had established purposeful discrimination.

In the case at bar, the state court acknowledged that a prima facie claim had been established (3T112-18 to 25). Thus satisfying the criteria set forth in step one (1). Step two was also met although the state court failed to acknowledge it. The mere fact that the state court had only heard explanations for only five (5) of the state's challenges is enough evidence to satisfy step two because twelve (12) peremptory challenges was the subject of the motion for a Mistrial and all twelve (12) should have been investigated. The district court cited both, Miller-El and Batson, in its reasoning for affirming petitioner's petition, although they should have been used to support petitioner's Batson claim. The most alarming thing about those two cases (Miller-El and Batson) [along with Lark v. Secretary of Pennsylvania D.O.C. also in support of petitioner's case] the district court cited is that their voir dire

6

was conducted numerous years later and petitioner's was conducted within one week of occurrence, in the matter of three days (10-10-01, 10-11-01, and 10-16-01). The mere fact that petitioner's Batson claim was fresh and its hearing was conducted immediately after the claim of bias jury selection, any jurist of reason would find the district court's decision debatable because the trial prosecutor couldn't justify why he'd excused a single (1) juror, let alone twelve (12), which were the subject of the motion for mistrial for the state excusing African American jurors for a discriminatory purpose.

The third step (step three), was met as well but the court erred by not closely analyzing the prosecutor's proffered reason's for each disputed strike in light of all the relevant circumstances.

The U.S. Supreme Court has emphasized that the trial court has a pivotal role in evaluating Batson Claims. The court has explained that the demeanor of the prosecutor exercising a challenged strike is often the best evidence of discriminatory intent. Meaning, the court is suppose to actively engage in the entire process, consulting its notes and correcting and questioning counsel. This couldn't be done with the case at bar because the state didn't keep any notes as to why he excused a single juror, neither have that court, although it's to his discretion to do so.

In spite of their not being any notes taken by the state or the court, any jurist of reason would find it debatable that counsel couldn't justify why he'd excused a single juror. In contrary to Batson, Lark v. Secretary of PA. D.O.C., and Miller-El (where there jurors were investigated years later), petitioner's hearing was conducted immediately after jury was satisfactory and there wasn't anymore challenges remaining for either party. Thus, leaving petitioner's counsel no other alternative but to request a mistrial.

The ultimate burden of persuasion regarding racial motivation rest with, and never shift from the opponent of the strike. A critical step in the Batson claim. After the prosecutor provide those explanations, counsel is allowed to dispute the validity of each explanation and the court is required to actively engage in the entire process. In the case at bar, not only did the court failed to conduct a proper hearing with regards to Batson, of hearing explanations for all twelve (12) of the

7

indictments in exchange for testifying against him."

The district court misconstrued petitioner's argument. Petitioner did compare his sentence (a total of 40 years) to that of so-called codefendant's (15 years) but not for the reasons advanced by the district court. Petitioner's argument was with respect to what the trial court advanced about their being "no free crimes" and sentencing petitioner consecutively, although the factual analysis in petitioner's case and sentencing criteria would properly call for imposition of concurrent sentencing. The sentencing court sentenced petitioner in accordance with Yarbough, 100 NJ 627, 644 (1985), to three consecutive terms of forty years (15, 18, and 7) for a single period of aberrant behavior (in contrary to the very same case he followed to sentence petitioner) and under a single indictment (01-02-559).

When the state court sentenced so-called codefendant (Aaron) concurrently to the same indictment (01-02-559) and two additional indictments (2000-4-1480 and 20000-4-1956) in which he received nearly one-third of petitioner's time is a clear indication that petitioner's federal rights were violated. Whatever societies interest in incarcerating petitioner for his crimes cannot rationally be justified as so disproportionately greater than society's interest in incarcerating so-called codefendant Aaron and any jurist of reason would find it debatable. Nelson v. Walker, 121 F.3d 828 (2nd Cir. 1997).

3. WHETHER THE JUDGE FAILURE TO ADVISE DEFENSE COUNSEL OF IN-CAMERA HEARING WITH REGARD TO POTENTIALLY SERIOUS JURY TAMPERING ISSUES, CAUSED DEFENSE COUNSEL TO BE DISADVANTAGED WITH REGARD TO TRIAL STRATEGY THAT WOULD HAVE CAUSED A DIFFERENT OUTCOME IN THE TRIAL

(RAISED ON DIRECT APPEAL IN PRO SE BRIEF AND
AGAIN IN A SECOND PCR PETITION AS POINT E)

Petitioner asserts that his federal rights were violated when the district court failed to hear his claim of potentially serious jury tampering. Had the district court entertained petitioner's argument, she may have disagreed with the state court decision.

The following took place in the In-Camera Hearing:

THE COURT: Let me ask you that having that encounter, do you think

9

that would affect your ability to remain fair and impartial and in no way biased or prejudiced as to both sides of the case. (10T68-11 to 14)

    MS. ROSACK: Yes -- yes, it will not affect it, no. (10T68-15 to 16)

    Indeed Ms. Rosack's response was confusing and the prosecutor inquired about it.

    MR. CHAMBERS: The way you said it. (10T68-17)

    MS. ROSACK: I have a problem with this. (10T68-18)

    Although Ms. Rosack indicated that she could continue to be fair and impartial, she made it clear that she had a problem with being approached and neither party (counsel, co-counsel, the prosecutor or the judge) have questioned Ms. Rosack with respect to the problem she repeatedly mentioned having with being confronted.

    With respect to the second juror (Ms. Klein), the following took place at the In-Camera Hearing:

    THE COURT: It was brought to my attention that during lunch time some people approached you, perhaps because you were jurors. I'd like you to explain that to me. (10T70-12 to 15)

    MS. KLEIN: They didn't really approach up, but we were sitting outside, and they came out, and they were walking past us, and she looked over, she was like, Free them, let them go, free our people. (10T70-16 to 21)

    THE COURT: Can you describe what they looked, who it was? (10T70-22 to 23)

    MS. KLEIN: There was an elderly lady, black lady, and she was with a man, he had a sweatshirt on, with another kid, and then the lady that said it, she was a younger black lady, heavyset, had on a cut-off shirt -- put a black jacket. (10T70-24 to 71-3)

    THE COURT: Did you notice the people in the courtroom earlier today? (10T 71-4 to 5)

    MS. KLEIN: Yeah. (10T71-6)

    Any jurist of reason would disagree with the state and the district court's conclusion not to all a mistrial, or in the alternative, have the two jurors who was confronted, replace by two of the three remaining alternates because the issue at bar has clear potential to taint a jurors mind on a subconscious level and leave them with the impression that

petitioner is guilty and hoping to be acquitted.

It was written into law as early as 1807 by Chief Justice Marshall in 1 Burn's Trial 416 (1807). The theory of the law is that a juror who has formed an opinion cannot be impartial." Reynolds v. United States, 98 U.S. 145, 155.

By the juror (Ms. Rosack) repeatedly stating that she had a problem with being confronted - indicates that she has formed a opinion of the petitioner and by all members of the court failing to voir dire her with respect to this problem, compounds to the error.

Impartiality is not a technical conception. It is a state of mind. However, when a judge is apprised of such a circumstance, he is obliged to interrogate the juror in the presence of counsel and to determine if there's a taint and if so, if any other jurors have been affected. If the court does not find a taint, it must then determine, assuming a sufficient number of jurors remain, whether the trial may proceed upon excusing the tainted jurors or whether a mistrial must be declared. If the trial court fails to so proceed and circumstances is indeed one which is apparently tainting, the taint must be presumed and a new trial ordered. Clearly, there's clear and convincing evidence that both jurors had the potential of being tainted on a subconscious level and may have been left with the impression that petition was guilty and hoping to be acquitted. This issue could have easily been resolved is either party of the courtroom would have just asked Ms. Rosack, what problem does she have with being confronted.

4. WHETHER PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, WHEN WHEN HIS TRIAL ATTORNEY REFUSED TO USE LATAYSHA ANDERSON AS AN ALIBI WITNESS

(RAISED IN FIRST PCR AS POINT A)

The district judge erred in her decision when indicating counsel wasn't deficient for failing to use Lataysha Anderson as an alibi witness because petitioner had not submitted an affidavit (or anything else) setting forth what she would have said. The district court further argued that even if Lataysha Anderson had testified, the trial court determined that the outcome would not have changed, given Hamadi Aaron's testimony.

11

Constitutional law requires counsel to contact alibi witnesses and locate witnesses who could have corroborated a petitioner's testimony. At a minimum, counsel has a duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case. Nealy v. Cabana, 764 F.2d 1173 (1985). I light of petitioner's trial boiling down to a swearing match between prosecution witness, who admitted committing the crime, and petitioner, who denied any part in it, and that the missing testimony might have affected the jury's appraisal of truthfulness of the state's witness and its evaluation of the relative credibility of the conflicting witnesses. Thus, the petitioner's 6th & 14th Amendment were violated.

The district decision should not stand because none of what she advanced in her opinion rings true. Petitioner's witness had went to the prosecutor's office and the trial prosecutor himself had his investigator take Ms. Lataysha Anderson downstairs to get her testimony. See Transcript 1T87-24 to 88-6) There were also a statement given to trial counsel on 10-10-01, that he'd written himself as to what Ms. Lataysha Anderson would testify too. (See DA-1) The witness would have corroborated petitioner's story that he was at Vailsburge Park at the time those crimes were being committed. Since counsel made no attempt whatsoever to interview petitioner's alibi witness is a clear case of professional error. Avery v. Praiesnik, 524 F.Supp, 2d 903 (2007)

Petitioner understands that counsel in not required to investigate any and everyone who name happens to be mentioned by a defendant but by him failing to investigate Lataysha Anderson (petitioner's one and only witness) who would have provided specific missing testimony that had the potential to clear petitioner. There was no reason for trial counsel not to have at least attempt to investigate petitioner's alibi and any jurist of reason would find him not doing so, debatable.

5. WHETHER PETITIONER CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE DISTRICT JUDGE ERRED IN HER DECISION NOT TO CONSIDER PETITIONER'S MIXED PETITION AS IN ALL-INCLUSIVE PETITION

The district court argued in her order that petitioner was untimely and

12

that 513 days had elapsed since he filed his first PCR and Habeas Corpus Petition. Petitioner counters that argument as he'd done on numerous occasions to the district judge and the state, As argued in my correspondence dated 11-09-09, addressed to the Hon. Katherine S. Hayden and again in response to the state's answer; petitioner's first PCR petition was originally filed on June 25, 2004, and not February 15, 2005, as the district court and state continue to stress. In support of this argument please see Document C-6, a letter from counsel (Brian Driscoll), dated November 9, 2004, to the Criminal Case Management Office - inquiring about petitioner's PCR petition that was filed earlier in the year (06-25-04). From the date the district court has petitioner down as filing (02-15-05), to when petitioner actually filed (06-25-04), that's a total of 240 days subtracted from that number (513). Thus, reducing that time to 273 days that had elapsed and the time petitioner had filed his petition with the U.S. District Court, which is well within the one year statute of limitation. Petitioner further argues ignorance with respect to the mixed petition and asked the court to hear them. Petitioner understands that ignorance is not a defense but he does try his best to follow all the rules of the court the best he can under the circumstances (doing all of his legal work himself (without any assistance from anyone and it's not by choice). Petitioner further argues that his mixed petition should be considered because he made the district court aware that he had a second PCR pending at the time he submitted his petition. With respect to petitioner not appealing some of the issues submitted to the state highest court, petitioner was under the impression that he didn't have to since the state court ruled that petitioner's claims has been previously adjudicated and I had already been there twice.

    The district court had numerous opportunities (5 years and 8 months) to inform petitioner that the issues he raised in his 2nd PCR would not be considered. Any jurist of reason would conclude that the district court's decision not to hear them, rested on error. Thus, violating the petitioner's federal rights.

6. WHETHER COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE PRISON GARB, HANDCUFFS, AND LEG-SHACKLES THAT SO-CALLED STATE WITNESS/CODEFENDANT (AARON) WORN DURING HIS TESTIMONY AT PETITIONER's TRIAL AND THE PRISON GARB THAT SO-CALLED CODEFEDANT DAWARA HAD WORN FOR FOUR DAYS DURING THE TRIAL HE HAD JOINTLY WITH PETITIONER

(RAISED IN SECOND PCR AS POINT B AND C)

Petitioner asserts that his 6th & 14th Amendments rights were violated when the state court allowed a state witness (who supposedly was a codefendant of petitioner) testify before the jury wearing prison garb, handcuffs and leg-shackles and other so-called codefendant Dawara, who had worn prison garb for four day at a trial he had jointly with petitioner. By allowing a witness to appear in such is improper under the fair trial analysis because it may affect a juror(s) judgement and it can be prejudicial to a defendant. Taylor v. Kentucky, 436 U.S. (1978).

Both the State and Federal Constitutional guarantees a petitioner the right to a fair trial before an impartial jury and any jurist of reason would debate that since both so-called codefendants (Aaron & Dawara) had worn prison garbs during petitioner's trial (Aaron equipped with handcuffs and leg-shackles). It has been well established in history that issues of this caliber deindividualizes a defendant. In other words, it may have lead the jury to believe that petitioner is guilty by association, thereby prejudicing the petitioner.

6. WHETHER COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE "TESTIMONY AND CONSENT TO SEARCH FORM" OF MS. CHESTINA COVINGTON WHICH CONTAINED THE INCORRECT ADDRESS, MISSPELLED NAME AD WAS OBTAINED AFTER A PRIOR ILLEGAL SEARCH

(RAISED IN FIRST PCR AS POINT N & IN SECOND PCR AS POINT D)

The 4th and 5th Amendment rights protects individuals from illegal searches. Florida v. Jimeno, 500 U.S. 248, 251 (1991), held that the validity of the Consent to search in both the custodial and on-custodial situations, must be measured in terms of waiver; i.e., where that state seek to justify a search on the basis of consent, it has the burden of that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent. Thus, the state has the burden of

14

it off to her the previous night. S-51

However, when Ms. Covington was showed the gun to see if she recognized it, she responded, "It looks like the gun except for the gun had tape around, had some tape around it." (9T20-4 to 7)

The prosecutor asked a second time in an improper, leading fashion in which Ms. Covington stated "I couldn't really testify, but it looks similar to that one, but the one he took out had tape on the handle. (9T20-8 to 11)

Clearly Ms. Covington wasn't unsure about what was taken from her home because she repeatedly testified that the gun they had taken from her home had tape on it and reiterated it on numerous other occasions when being cross-examined by counsel and co-counsel.

6. WHETHER COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE TYPED STATEMENTS OF M'. SHAMECCA HYNES, WHOSE STATEMENTS WAS ALLOWED INTO EVIDENCE BUT DID NOT APPEAR AT DEFENDANT'S TRIAL TO VARIFY GIVING AND SHE WAS ONLY SIXTEEN (16) YEARS OF AGE AT THE TIME SHE'D GIVEN IT

(RAISED IN SECOND PCR IN POINT F)

Petitioner argues that his 6th and 14th Amnd. Rights were violated when counsel and the state failed to subpoena Ms Hynes who had given a formal statement to detective William Maldonado on 10-2-00, and supposedly turned over a gun that so-called codefendant Dawara dropped of to her the previous night. See DA-51

If you reflect to transcript (9T28-25 to 30-19) when asked by...

MR. JONES: When you wet to the police department with Shamecca and the two detectives, was Shamecca questioned by one detective or two detective.

MS. COVINGTON: One

MR. JONES: And when she was asked, how far away from her -- how far away from them were you?

MS. COVINGTON: Where the lady's sitting, maybe the seat behind her, that's sitting back there and I was sitting over there.

MR. JONES: Okay.

THE COURT: Indicating the second row in the gallery.

MS. COVINGTON: Second row back, behind the lady.

16

It was then asked by counsel (Mr. Jones) if the detective knew that she were taking care of Ms. Hynes?

MS. COVINGTON: Yes, he knew because that she was staying with me.

MR. JONES: And how did he know that?

MS. COVINGTON: Because I told him when I got there. I told him that she's been staying with me, but she's wasn't there last night when they came.

MR. JONES: And how old was Shamecca then?

MS. COVINGTON: Sixteen.

MR. JONES: Did the detective know that she was sixteen years old?

MS. COVINGTON: Yeah, he knew, I told him she was 16.

MR. JONES: And the detective did not ask you to be present while she was being interviewed, did he?

MS. COVINGTON: No.

MR. JONES: Did he tell you you had the right to be there when she was being interviewed?

MS. COVINGTON: No, he told me to sit down by the door and he took her over in the corner.

Petitioner's 6th & 14th Amend. rights were violated when the state failed to produce Ms. Shamecca Hynes, whose statements was introduced into evidence as well as the weapon she supposedly turned over; but didn't attended the petitioner's trial (or any other proceeding) to varify giving it. Ms. Hynes whereabouts was known (9T24-19 to 20) and counsel should have subpoenad her because cross-examining witnesses against someone is routinely regarded as the most effective means of challenging the credibility of a witness and thereby discovering the truth. Luedtke v. Shobert, 342 NJ Super. 202, 21 (App. Div. 2001)

17

7. WHETHER PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO CROSS-EXAMINE STATE WITNESS RONNIE SANDERSON, (5T131-11 to 13)

(RAISED IN FIRST PCR POINT AS H AND SECOND PCR AS POINT G)

Petitioner asserts that his 6th and 14th Amend. rights were violated when counsel failed to cross-examine state witness/victim Mr. Sanderson with respect to him being robbed of a pager as he testified to at petitioner's trial. But on the night in question (10-24-00), he had given a signed statement indicating that nothing was taken from him; he refused medical attention and he was told that he could leave.

He testified that while he was in route home, he realized that his pager was missing and returned to the scene and gave a formal statement to the investigating officer (5T129-1 to 15) There were no such reports and every member of the court (counsel, co-counsel, the prosecutor and the judge) was aware of it. (5T118-13 to 120-9)

Any jurist of reason would find that had the district court entertained this issue as it should, she would have agreed with petitioner i spite of their not being any federal cases to support his argument. Please keep i mind that petitioner does all of his legal work himself and to the best of his ability, so please be patient and understanding with petitioner.

Nevertheless, counsel should have cross-examined and objected to Mr. Sanderson's accusations for several reason's: There weren't any police reports, incident reports, or any other reports indicating that he was ever robbed of a pager or anything else. He didn't even go to the grand jury as required by law. Counsel should have investigated this matter to see if Mr. Sanderson even had a pager at that time; if so, if he had it replaced as he stated. Especially since he testified that it was being used days later and that a smart beep was added. (5T132-14 to 19) An investigation may have revealed relevant information that could have been used to discredit his testimony at trial.

18

8. WHETHER PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO CHALLENGE THE INDICTMENT AGAINST PETITIONER IN WHICH ONLY ONE (ANGEL LUNA SR.) OF THE FOUR VICTIMS/WITNESSES TESTIFIED BEFORE THE GRAND JURY

(RAISED IN SECOND PCR IN POINT H)

Petitioner argues that his federal rights were violated when his attorney failed to challenge since only one (Angel Luna Sr.) of the four victims/witnesses testified before the grand jury and even he didn't provide any relevant information or present any evidence to show that the defendant was guilty of the charges. State v. Costa, 109 NJ Super. (1970) He (Mr. Angel Luna Sr.) repeatedly testified that he was maced and forced to the ground. He couldn't identify anyone or anything but the army fatigue jacket that was worn during the robbery. (So-called codefendant Aaron was said to be wearing that jacket and he admitted to wearing it during the commission of the robbery. State v. Chandler, 98 NJ Super. 241 (1967) states that by jurors failing to receive evidence in support of the charges, the grand jury abdicated its responsibilities and the Indictment was returned in disregard of the defendant's right not to be held to answer for a criminal offense unless on the presentment or indictment or a grand jury which effectively stood between the defendant and constitution. Hale v. Henkle, 201 U.S. 43, 59 (1906)

Mr. Angel Luna Sr. was never robbed of anything, just maced and forced to the ground and all reports and his testimony supports petitioner's claim. See Grand Jury Minutes dated 01-30-01, and Trial Transcript dated 10-24-01.

Among factors to be considered is if a witness and/or victim should appear before a grand jury as required by law are the complexity of the case and the availability of the witnesses with first-hand knowledge. U.S. v Umana, 368 F.2d 725 (2 Cir. 1966)

In the case at bar, there is no difficulty in producing witnesses appears, they were all local people the case itself is relatively simple and no sound reason had been advanced by the state to justify its virtually exclusive reliance of hearsay.

In closing Detectives William Maldonado, Morad Muhammad, and Robert

19

Moore; testified at the Grand Jury on behalf of the other three victims. During their testimony, the prosecutor (Mr. Hulling) had give flagrant use of leading questions which left the detectives to use just affirmative responses because all the information was in the question. See State v. Holsten, 223 NJ Super. (1988) Petitioner's attack is not just focused upon the absence of any witness with relevant information, which is observed to be hearsay, though excludable on objection, may nevertheless be "rationally persuasive" and for that reason may furnish a valid support for an indictment. See U.S. v. Costello, 221 F.2d 658, 677 (1955)

### THIS APPLICATION FOR A COA FOLLOWS

Based on the above questions the District Court should have issued a Certificate of Appealability on the ground that throughout the entire proceeding, petitioner has exercised due diligence in filing the necessary requests with the proper authorities, "the petitioner has made a substantial showing of a denial of a constitutional right."

The original dispute in this matter is whether the petitioner's first 2254 habeas petition was timely filed on March of 2008.

This court has never issued a order for the petitioner to show cause why a certificate of appealability should not be granted.

This court has never given petitioner the opportunity to show cause in the district court as to the timeliness of the petition for writ of habeas corpus.

WHEREFORE, Petitioner respectfully request that this Court grant his application for a certificate of appealability, and once the timelines is resolved, he be given a opportunity to amend the habeas petition, if necessary to address any concerns of the petition.

I, Maurice Anderson, declare under penalty of perjury that I have read and subscribes to the above and state that the information contained therein is true and correct to the best of my knowledge.

Respectfully Submitted,

*Maurice Anderson*

Maurice Anderson

February 1, 2015

20



Maurice Henderson #427620 #769537-B
Lock Bag - R
East Jersey State Prison
Rahway, New Jersey 07065

United States Court of Appeals
For The Third Circuit
c/o The Clerk of the Court
21400 United States Courthouse
601 Market Street
Philadelphia, PA 19106